```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION


UNITED STATES OF AMERICA,        )  Tampa, Florida
                                 )
                    Plaintiff,   )  No. 8:17-cr-37-T-33AEP
                                 )
              vs.                )  February 22, 2018
                                 )
DAVID PAUL LYNCH,                )  3:00 p.m.
                                 )
                    Defendant.   )  Courtroom 14B
_____  )
```

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**GOVERNMENT COUNSEL:**

       **Jennifer L. Peresie, Assistant U.S. Attorney**
       **Eric Gerard, Assistant U.S. Attorney**
       United States Attorney's Office
       400 North Tampa Street, Suite 3200
       Tampa, Florida 33602
       (813) 274-6000

**DEFENSE COUNSEL:**

       **Mark J. O'Brien, Esq.**
       **Victoria E. Hatfield, Esq.**
       O'Brien Hatfield, PA
       511 West Bay Street, Suite 330
       Tampa, Florida 33606
       (813) 228-6989

              **ALSO PRESENT:**

              Stephen Edwards,
              Probation Officer

              Meghan Buck,
              FBI Task Force Agent

                  - - -

## TABLE OF CONTENTS

### EXAMINATIONS

| DEFENDANT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VALERIE McCLAIN, PH.D. | 13 | 23 | | |

### EXHIBITS

| DEFENDANT | PAGE | LINE |
|---|---|---|
| 1...................... | 23 | 19 |

- - -

<u>**P R O C E E D I N G S**</u>

1

2   February 22, 2018                                         3:02 p.m.

3                              - - -

4            COURT SECURITY OFFICER:  All rise.

5            The United States District Court in and for the

6   Middle District of Florida is now in session.  The Honorable

7   Virginia M. Hernandez Covington presiding.

8            Please be seated.

9            THE COURT:  Good afternoon.

10           We are here for the sentencing in *United States*

11  *versus David Paul Lynch*, Case No. 8:17-cr-037-T-33AEP.

12           I'll begin by having counsel state their

13  appearances.  Who do we have for the government?

14           MS. PERESIE:  Good afternoon, Your Honor.

15  Jennifer Peresie and Eric Gerard for the United States, and

16  with us at counsel table is Meghan Buck, task force officer

17  with the FBI.

18           THE COURT:  Thank you very much.

19           For the defendant.

20           MR. O'BRIEN:  May it please the Court, my name is

21  Mark O'Brien, and seated to my right, your left, is David

22  Paul Lynch.

23           THE COURT:  Thank you.  And we have Mr. Edwards

24  from probation.

25           I see the last pleading was -- I think these have

1   been resolved.  I see a forfeiture issue pending, but I think

2   it's been resolved.  I think I set that for March the 15th,

3   but I recall seeing a response from the forfeiture AUSA, Jim

4   Muench, saying it should all be resolved by the time of the

5   hearing.  That's the only issue I see, and that's separate

6   and apart from the sentencing.

7           David Paul Lynch, on October 13th, 2017, a jury

8   found you guilty of Counts One through Twelve of the Third

9   Superseding Indictment.

10          Counts One through Five and Seven through Nine

11  each charge you with production of child pornography, in

12  violation of Title 18, United States Code, Sections 2251(a)

13  and (e).  Count Six charges you with traveling in foreign

14  commerce to engage in illicit sexual conduct with a minor, in

15  violation of Title 18, United States Code, Section 2423(b).

16          Count Ten charges you with receipt of child

17  pornography, in violation of Title 18, United States Code,

18  Section 2252(a)(2) and (b)(1).

19          Count Eleven charges you with attempting to travel

20  in foreign commerce to engage in illicit sexual conduct with

21  a minor, in violation of Title 18, United States Code,

22  Section 2423(b) and (e).

23          Count Twelve charges you with possession of child

24  pornography, in violation of Title 18, United States Code,

25  Section 2252(a)(4)(B) and (b)(2).

1          The Court hereby adjudges you guilty of those

2    offenses.   We have now reached the stage in the proceedings

3    where it is my duty to address several questions to you and

4    your attorney and the counsel for the government.

5          Miss Peresie, have you had the opportunity to read

6    the presentence report?

7          MS. PERESIE:  Yes, Your Honor.

8          THE COURT:  Do you have any objections as to the

9    factual accuracy of the report?

10         MS. PERESIE:  No, Your Honor.

11         THE COURT:  Do you wish to make any objections to

12   the probation officer's application of the guidelines?

13         MS. PERESIE:  No, Your Honor.

14         THE COURT:  Thank you, Miss Peresie.

15         Mr. O'Brien, have you had the opportunity to read

16   and discuss with Mr. Lynch the presentence report?

17         MR. O'BRIEN:  Yes, Your Honor.

18         THE COURT:  Do you have any objections as to the

19   factual accuracy of the report?

20         MR. O'BRIEN:  No, Your Honor.

21         THE COURT:  Do you wish to make any objections to

22   the probation officer's application of the guidelines?

23         MR. O'BRIEN:  No, Your Honor.

24         THE COURT:  Thank you.

25         There being no objections to the factual

1 statements and guideline calculations contained in the

2 presentence report, the Court adopts those statements as its

3 findings of fact and determines that the advisory guidelines

4 are:

5           Total Offense Level 43, Criminal History

6 Category I, 3,960 months' imprisonment, two years to life on

7 Counts One through Five, five years to life on Counts Six

8 through 12 of supervised release, restitution is not

9 applicable, 50,000 to $250,000 fine, and a $1200 special

10 assessment.

11           Mr. O'Brien, I can ask the government first for

12 their recommended sentence.  I didn't know if you wanted

13 to -- you have your expert witness here.  How would you like

14 to proceed?

15           MR. O'BRIEN:  I'll defer to Mr. Gerard and

16 Miss Peresie.

17           THE COURT:  Very good.  Miss Peresie, do you know

18 of any reason why this Court should not now proceed with

19 imposition of sentence?

20           MS. PERESIE:  No, Your Honor.

21           THE COURT:  This is your opportunity to make a

22 statement with respect to what an appropriate sentence for

23 Mr. Lynch would be.

24           MS. PERESIE:  Yes, Your Honor.

25           Your Honor, the United States is asking for a

1  guideline sentence.

2          THE COURT:  Of 3,960 months?

3          MS. PERESIE:  Yes, Your Honor.  And we are asking

4  for that sentence to reflect the harm to Liza, to Erica, to

5  Rica, to Denise, and to the other children defendant

6  victimized in the Philippines.

7          The evidence at trial made clear that David Lynch

8  exploited, abused, and took advantage of young children in

9  the Philippines.  Through the sentencing memo and through his

10 expert, we learned he apparently thought doing so was okay.

11 He thought children outside the United States had a lower

12 value than children in the United States.  It was okay

13 because his victims were in the Philippines.

14         We all saw and recall the images and the videos of

15 that abuse.  It's souvenirs of abuse of Liza, Erica, Rica,

16 and Denise.  And we don't have their victim impact statements

17 because they haven't been located, but we do have their words

18 at the time the defendant abused them.

19         We saw in the video Liza say it hurt.  We heard

20 Erica say, "My vagina hurts."  The defendant hurt and abused

21 these children.  We saw the text from the defendant's

22 youngest victim at trial, eleven-year-old Denise, and she

23 texted "I'm scared."  She was scared of what the defendant

24 was about to do to her.

25         We saw the defendant's conversations and his text

1  messages and in his e-mails discussing the abuse, discussing

2  his intent to abuse countless others in the Philippines

3  because he thought these children were of less value.

4         The penalties set by Congress for these crimes

5  convey a message of absolute intolerance for the crimes.  The

6  sentence imposed by this Court should do the same.  As the

7  Eleventh Circuit stated in *United States versus Saris*, child

8  sex crimes are among the most egregious and despicable

9  societal and criminal offenses.

10         Your Honor, it doesn't get much more despicable

11  than what this man did.  The requested sentence reflects

12  years of abuse of vulnerable children, countless victims, and

13  that overwhelming despicableness.

14         THE COURT:  Well, I, unfortunately, have seen some

15  pretty disturbing cases myself in this court.  Not that long

16  ago I sentenced somebody to life in prison.  The only other

17  time I had done it is when I didn't have a choice.  It was on

18  the enhancement.

19         Here I did it where somebody was going to meet a

20  child for sex, and the person pled guilty, and I sentenced

21  that person to life in prison.  They did meet the girl for

22  sex.  It wasn't just the anticipated.  It actually happened,

23  and I did sentence him to life in prison.

24         So I most certainly understand how damaging and

25  how horrible these crimes are.  I guess the hesitation that I

1  have is, 330 years?

2          MS. PERESIE:  Your Honor, 330 years is the

3  guidelines.  Certainly 330 years is a high sentence because

4  of the number of counts.  It's a high sentence --

5          THE COURT:  What is he, 58 years old?  I think

6  that's what I saw.  Chances are the most that he would live

7  is 30 years or maybe 35.  People don't tend to live beyond

8  90.  There are some people that do, but most people die in

9  their 80s.  I just don't know what's -- explain to me what's

10  to be gained by imposing a sentence that high versus a

11  sentence where he's going to be in jail for the rest of his

12  life, to protect society?

13          That's what I look at, protecting society, because

14  an 88-year-old can hurt children, too.  It's harder for them

15  to do it at 88 because they are not as mobile, but they most

16  certainly can.  So I understand the importance of protecting

17  society, but why impose a sentence that's so substantial?

18          MS. PERESIE:  Because of the seriousness of the

19  offense, because of the number of victims.  This sentence,

20  Your Honor, like any sentence sends a message on the

21  seriousness of the offense.

22          It's not okay for this defendant to think these

23  children are of less value, and a substantial sentence both

24  protects the public and reflects that 3553(a) factor of how

25  serious this offense was.

```
 1                THE COURT:  Okay.  Anything else you would like to
 2      say?
 3                MS. PERESIE:  No, Your Honor.
 4                THE COURT:  Okay.  Thank you, Miss Peresie.
 5                Mr. O'Brien, I'm going to turn to you.  Do you
 6      know of any reason why this Court should not now proceed with
 7      imposition of sentence?
 8                MR. O'BRIEN:  No, Your Honor.
 9                THE COURT:  This is your opportunity to make a
10      statement, present any information in mitigation of the
11      sentence.
12                And, Mr. Lynch, you have the right to address the
13      Court directly.  You don't have to, but I wanted to make
14      certain that you understand that you have that right.
15                Do you understand that, Mr. Lynch?
16                THE DEFENDANT:  Yes, Your Honor.
17                THE COURT:  Okay.  Go ahead, Mr. O'Brien.
18                MR. O'BRIEN:  Your Honor, prior to Mr. Lynch's
19      allocution, with the Court's permission, the defendant calls
20      Dr. Valerie McClain.
21                THE COURT:  Dr. McClain, thank you.  I know we
22      moved this hearing, and I appreciate you being here in person.
23                THE WITNESS:  No problem, Your Honor.
24                THE COURTROOM DEPUTY:  Please raise your right
25      hand.
```

```
 1              Do you solemnly swear or affirm under penalty of

 2    perjury that the testimony you shall give in this cause will

 3    be the truth, the whole truth, and nothing but the truth?

 4              THE WITNESS:  I do.

 5              THE COURTROOM DEPUTY:  Please state your name for

 6    the record.

 7              THE WITNESS:  Dr. Valerie McClain, M-c-C-l-a-i-n.

 8              THE COURTROOM DEPUTY:  Please have a seat.

 9              THE COURT:  Go ahead, Mr. O'Brien.

10              MR. O'BRIEN:  Your Honor, I believe Dr. McClain

11    has testified before Your Honor before?

12              THE COURT:  She has.

13              MR. O'BRIEN:  I know she's testified in front of

14    Miss Peresie in a separate federal criminal case.  In the

15    interest of judicial economy, I tender Dr. McClain as an

16    expert witness in order to testify here today in forensic

17    psychology.

18              THE COURT:  Any objection, or do you wish to voir

19    dire the witness on that, Miss Peresie?

20              MS. PERESIE:  No objection.

21              THE COURT:  I think she most certainly is

22    qualified to testify as an expert witness in the field of

23    forensic psychology, so you may proceed with that.  I'm very

24    familiar with her.  She's had a number of cases in front of

25    me.  That's fine.  You may proceed.
```

```
 1              THE WITNESS:  Thank you, Your Honor.
 2                   VALERIE McCLAIN, PH.D.,
 3   having been first duly sworn by the Courtroom Deputy,
 4   testified as follows:
 5                   DIRECT EXAMINATION
 6   BY MR. O'BRIEN:
 7   Q.    Please state your name and spell your last.
 8   A.    Dr. Valerie R. McClain, M-c-C-l-a-i-n.
 9   Q.    Did you have an opportunity to come into contact with a
10   person who either was known to you or later became known to
11   you as David Paul Lynch?
12   A.    Yes, I did.
13   Q.    How did you come into contact with Mr. Lynch?
14   A.    I was retained by your office, by yourself, to evaluate
15   Mr. Lynch for the purposes of assisting with potential
16   factors -- mitigating factors for sentencing.
17   Q.    Did I or my office, rather, provide you with documents,
18   court documents, presentence investigation reports, things
19   related to his charges and convictions?
20   A.    Yes.
21   Q.    Were you able to review those?
22   A.    I was.
23   Q.    Did you have an opportunity to visit Mr. Lynch?
24   A.    I did.
25   Q.    And where did you visit Mr. Lynch?
```

1    A.    I saw Mr. Lynch at the Citrus County Detention Center

2    in Lecanto, Florida.

3    Q.    How many times did you visit with Mr. Lynch?

4    A.    I saw him on three occasions.

5    Q.    Please express to Her Honor the dates that you saw

6    Mr. Lynch.

7    A.    Certainly.  I saw Mr. Lynch on December 6th, 2017,

8    January 16th, 2018, and February 5th, 2018.

9    Q.    Please explain to Her Honor the history and background

10   information that played a role in your ultimate opinion in

11   this case.

12   A.    Certainly.  With regard to my interviews with

13   Mr. Lynch, I did inquire as to his psychosocial development

14   and background.  I also inquired as to medical issues he has

15   had in the past and currently.

16          With regard to medical issues, he does have

17   several factors that I think are important.  Hypertension,

18   high cholesterol, allergic rhinitis, tendonitis in his

19   shoulders.  He was being prescribed medication when I saw him

20   for those issues.

21          He was also at one point prescribed medication by

22   his primary doctor for anxiety in 2005, around the time of

23   his mother's illness; however, he discontinued it because it

24   had a bad effect on him, an adverse impact on him.  So that

25   was the only type of psychiatric medication that was ever

1  prescribed; and it wasn't by a psychiatrist, but rather just

2  something given at the time that he had depression and

3  anxiety due to his mother's illness and impending death.

4          When I met with him on the third occasion, he had

5  been stabilized on Prozac; and we had discussed symptoms that

6  he was experiencing of depression, not just related to the

7  present, obviously, the sentencing, facing life in prison,

8  but also to prior issues regarding his mother's death.  So he

9  was taking Prozac.

10          With regard to substance abuse, I think this is

11  very significant.  He acknowledged the use of alcohol and, in

12  particular, a progressive worsening of his addiction to

13  alcohol.

14  Q.    Let me jump in there.  Did he start abusing alcohol at

15  the age of, what, 13?

16  A.    Thirteen years old.

17  Q.    Please continue.

18  A.    And I think it's significant because with regard to his

19  way of coping with situations, he developed a pattern of

20  using alcohol basically to cope, especially at the time his

21  marriage became more of a live-in situation and not an

22  intimate partnership.

23          During that period of time it did become more

24  prevalent for him to be using the alcohol, and that would

25  have been approximately 2002 until the present.

1  Q.   Let me interrupt you for a moment.

2        Was his use of alcohol daily?

3  A.   He was using daily, yes.

4  Q.   Was he drinking to intoxication?

5  A.   Yes, he was.

6  Q.   Was he essentially passing out at the end of each day?

7  A.   He was.

8  Q.   I would like to draw your attention to the idea of

9  self-medicating.  What is that?

10 A.   Self-medicating is essentially a pattern of using

11 substances and/or activities to essentially numb oneself out,

12 to not address emotional issues that may be current, such as

13 anxiety, depression, situational factors, such as marital

14 estrangement.  So it's a pattern of using something that

15 would be, for instance, a substance or activity to

16 essentially numb out.

17 Q.   Did Mr. Lynch's descriptions of facts of his life meet

18 the criteria for self-medicating by alcohol?

19 A.   Yes.  And he did have a prior DUI as well.

20 Q.   Please continue.

21 A.   Just with regard to personal factors, I mentioned that

22 his mother did become ill, very ill in 2005, and he was part

23 of taking care of her, day in and day out, and also

24 ultimately became involved in managing the estate, being the

25 executor of the estate, which led to conflicts and splitting

1    with his family and creating tension so that there was

2    further isolation as far as not having family available for

3    normal communication and talking with.

4    Q.    Did you learn about Mr. Lynch's trips to the

5    Philippines?

6    A.    Yes, I did.

7    Q.    Did you discuss with him what he did while he was in

8    the Philippines?

9    A.    Yes, I did.

10   Q.    Were some of his activities, at least by standards of

11   the United States, criminal in nature?

12   A.    Absolutely.

13   Q.    Were some of his activities -- regardless of whether or

14   not it would violate a criminal statute, could they be deemed

15   immoral or engaging in prostitution, for example?

16   A.    Yes.

17   Q.    Did he also have a noncriminal or a non-immoral purpose

18   in going to the Philippines?

19   A.    Yes.

20   Q.    Would you please flesh that out for Her Honor.

21   A.    Well, in talking with him about his trips to the

22   Philippines, essentially, he told me that one of the things

23   that he did -- it was like a relief to go over there, to take

24   time to, essentially, spend time over there.  At that time he

25   would not drink.  He was abstinent from drinking.

1  Q.    Let me interrupt you right there.

2           What did that tell you, the fact that he went over

3  to the Philippines and his mood changed, he did not drink?

4  What did that -- from your professional opinion, what did

5  that trigger?

6  A.    Well, in an assessment of addiction, I saw it as a

7  tradeoff from one addiction to another addiction.  In other

8  words, there was an elation about going over to the

9  Philippines, like an escape to the Philippines, where there

10  was a plan, obviously, to engage in what we would call

11  immoral criminal acts, that somehow or another he became

12  accustom to thinking were justified or normal, which, of

13  course, they are not.  So there is a problem.  There is a

14  huge problem with that.  But it created, I think, that sense

15  of like being the big guy on campus, if you will.

16  Q.    So let's contrast that with Mr. Lynch's day-to-day life

17  in Venice, Florida.  Again, starting around 2002 and moving

18  forward, contrast what he told you as to how he felt when he

19  was in the Philippines versus how he felt as David Lynch,

20  owner of a small business, living in Venice, Florida.

21  A.    I think, essentially, when he was in the Philippines he

22  was big man on campus; and, unfortunately, the relationships,

23  the involvements he had led to exploitation of children,

24  abuse of children.  And, unfortunately, in come cultures it's

25  considered normal to exploit their own children, which, of

1    course, is not normal.  But I think that the cultural

2    difference, discrepancy was something he bought into.

3    Q.    Did Mr. Lynch go to the Philippines the very first time

4    with the intention of having sexual activity with minors?

5    A.    Not to my knowledge.

6    Q.    Did Mr. Lynch, over the course of his multiple trips to

7    the Philippines, grow to believe it was acceptable to engage

8    in sexual activity with minors?

9    A.    He definitely believed that and believed that, in fact,

10   there was a -- I'm trying to find the best word for this.

11   That he was doing something for the child and for the parent.

12   In other words, I would call it rationalizing the

13   exploitation and the abuse.

14   Q.    With respect to his trips over there, did they start

15   off with kind of that immoral activity that some would

16   determine to be immoral?

17          I'm not playing the moral police today, but the

18   prostitution, unlawful adult prostitution that's prevalent in

19   certain areas of the Philippines, and then gradually lower

20   itself into what in the United States would be illegal

21   activity, which is sexual contact with minors?

22   A.    Again, I harken back to the whole belief system within

23   that culture that would be considered the norm, such as

24   exposure to sexual partners of any age, without the

25   protection you would see I think more so in the United States

1    where we try to differentiate and have those values there.

2              In other words, there is a whole market in

3    exploiting children and exploiting people to gain revenue,

4    basically.  But I think it started, and it became a slippery

5    slope that he fell down.

6    Q.    Did you inquire as to whether or not Mr. Lynch has ever

7    harmed a child in the United States?  And what I mean by

8    harm, engaging in any sort of sexual contact, photographing

9    minors; any type of similar activity that occurred in the

10   Philippines while here in Venice, Florida, or anywhere else

11   in the United States.

12   A.    I did.

13   Q.    What was his response?

14   A.    His response was that he had not engaged in this type

15   of activity.

16   Q.    Why not?

17   A.    Well, unfortunately, there is what we call a double

18   standard.  He has a daughter, a grown daughter; and I think

19   for him, he separated morality for what we call his own

20   family, American culture as different from the Filipino

21   culture.

22             In other words, as I heard stated, he sees them

23   less than and dehumanizing.  There was definitely a

24   discrepant treatment for the values and behaviors.

25   Q.    Based on your training and experience and research of

1  the sex business, for lack of a better phrase, in the

2  Philippines, is that uncommon?

3  A.    I've had multiple cases involving this type of

4  situation, but also involving the same cognitive errors.  I

5  call them cognitive errors because there is basically two

6  different belief systems.

7          I think they feed into rationalizing the

8  perpetration on children, rationalizing somehow they are

9  lesser creatures and you are doing them a favor because you

10 are helping them monetarily, which I think is very, very

11 immoral and, of course, criminal.

12 Q.    Did you have a conversation with Mr. Lynch about

13 exactly that?

14 A.    I did.  I had several conversations with him about that.

15 Q.    Over the course of your three forensic evaluations and

16 discussions, for lack of a better phrase, with Mr. Lynch, did

17 Mr. Lynch change his belief system as to what occurred from

18 2005 onward?

19 A.    He did.  And I think specifically for the purposes of

20 testimony today, what I was concerned about when I first met

21 with him is still what I perceived as the denial of this

22 discrepant treatment of children and of the culture itself.

23 So I asked him to think about what we had talked about and I

24 would come back and meet with him, because it is an

25 entrenched belief system that has to be approved, so it's not

1   going to disappear.

2              I think, as I stated earlier, the rationalization

3   that you are doing someone a favor monetarily, providing

4   things to that family or the parent of that child, that has

5   to be addressed as well.  Over the course of my three

6   sessions with him, I discussed impact extensively with him;

7   and I think that is the heart of where I felt it was

8   important for him to break through.

9   Q.    Was there a breakthrough?

10  A.    There was.

11  Q.    Do you believe that Mr. Lynch understands that there is

12  no distinction between behavior in the Philippines and the

13  behavior, say, again, in Venice, Florida?

14  A.    I think that basically the rude awakening was him

15  having been charged with the present charges has caused the

16  denial to be broken through, which is the first step in

17  rehabilitation.

18  Q.    Let's pick up right there.

19             Can this defendant, in your opinion, be

20  rehabilitated?

21  A.    I think that over time Mr. Lynch can be rehabilitated

22  through intensive intervention.  He is not justifying his

23  actions any longer.  He accepts responsibility for his

24  actions, and there is treatment for his substance abuse,

25  his -- I would call it some depression; also, more

1    importantly, his sexual disorder.

2           There is basically treatment that focuses on

3    cognitive behavioral change.  And he's bright, and those

4    cognitive errors that he has certainly can be addressed

5    through group treatment and individual treatment.

6    Q.    In preparation of today's hearing, did you create a

7    forensic psychological evaluation report?

8    A.    I did.

9    Q.    And did you provide that to me?

10   A.    I did.

11          MR. O'BRIEN:  Your Honor, I filed my sentencing

12   memorandum, which is document 121, on CM/ECF, filed on

13   February 9th, 2018.  Exhibit No. 1 was the forensic

14   evaluation.  At this time I would offer that into evidence.

15          THE COURT:  Okay.  Any objection to that from the

16   government?

17          MS. PERESIE:  No, Your Honor.

18          THE COURT:  Okay.  It's received into evidence.

19          (Defendant Exhibit 1 received in evidence.)

20          MR. O'BRIEN:  I tender the witness.

21          THE COURT:  Miss Peresie, any questions?

22          MS. PERESIE:  Yes, Your Honor.

23                     CROSS-EXAMINATION

24   BY MS. PERESIE:

25   Q.    Let me just start by clarifying, Dr. McClain, there is

1  no question in your mind that the defendant understood what

2  he was doing in the Philippines; is that right?

3  A.    That's correct.

4  Q.    And you are saying that he did what he did because he

5  thought he was the big guy on campus.  Was that your

6  testimony?

7  A.    No.  I think that he did what he did because it served

8  to gratify his needs.  I was asked a question how was it

9  different in how he felt when he was over in the Philippines.

10 But as to specific causality, I wouldn't say he did what he

11 did because he was big man on campus.  I think in his

12 discussion with me he very specifically talked about

13 gratification, specifically sexual gratification.

14 Q.    And that sexual gratification was in abusing very young

15 Filipino girls?

16 A.    Yes.

17 Q.    And you are aware one of those girls was

18 eleven-year-old Denise?

19 A.    Absolutely.

20 Q.    Mr. Lynch traveled to the Philippines to sexually abuse

21 eleven-year-old Denise?

22 A.    That's correct.

23 Q.    You testified about depression, anxiety, and alcohol

24 abuse and Mr. Lynch's history with that.  Let me ask you, at

25 least with the alcohol abuse, was it your testimony that

1  didn't have a role because he wasn't using and abusing

2  alcohol in the Philippines?

3  A.    Quite the opposite.  My testimony was that it's trading

4  one addiction for the other, whether it's a sexual addiction,

5  inappropriate sexual addiction, or an addiction to alcohol.

6  What I was communicating was that what he told me was,

7  ironically, he didn't drink in the Philippines; and I asked

8  him, why do you think that's the case?

9  Q.    But you are certainly not saying alcohol caused him

10  to --

11  A.    Absolutely not.  No.  No.  Alcohol certainly didn't

12  cause him to do that.

13  Q.    You're not saying there is any causal connection

14  between depression or anxiety and abusing eleven-year-old

15  Denise in the Philippines?

16  A.    No, I don't think there is a causal connection.  I

17  think there are factors in his life that led him to being

18  isolated and developing an addiction.

19  Q.    Would you agree that depression and anxiety are pretty

20  common in the United States?

21  A.    Certainly.

22  Q.    They are pretty widely diagnosed mental health problems

23  of millions of Americans?

24  A.    Yes.

25  Q.    The vast majority of Americans with depression or

1 anxiety do not go and sexually abuse children?

2 A.    That's correct.

3 Q.    The vast majority of -- are there also lots of

4 Americans struggling with alcohol addiction?

5 A.    Yes.

6 Q.    Is it true that the vast majority of these people don't

7 abuse children?

8 A.    To my knowledge, yes.

9 Q.    So that's not a part of being addicted to alcohol?

10 A.    What's not a part?

11 Q.    Abusing children.

12 A.    I don't think the diagnostic criteria for alcohol abuse

13 disorder has anything to do with abusing children in it.

14 Q.    Are you aware of any scientifically supported evidence

15 of a causal relationship between alcoholism and sexual abuse

16 of children?

17 A.    I would not make that statement, no.

18 Q.    Are you aware of any such evidence connecting

19 depression or anxiety to sexual abuse of children?

20 A.    No.

21 Q.    So you're not saying that depression or anxiety or

22 alcohol abuse was what allowed Mr. Lynch to rationalize that

23 sexual abuse of eleven-year-old Denise?

24 A.    That's correct.

25 Q.    The defendant committed the crimes because he thought

1  that children from outside the United States had a lower

2  value than American children; is that true?

3  A.    I think that's part of it, yes.

4  Q.    It's your testimony that he changed that belief system

5  from 2005 to 2017 once he had three meetings with you in

6  preparation for sentencing?

7  A.    No, not at all.  I think what I said was, I confronted

8  the denial with him and I think that his belief system has

9  been challenged.  It's not cured by any manner.

10 Q.    So is it your testimony, then, that he still believes

11 children in the Philippines have less value --

12 A.    No.

13 Q.    -- than children in the United States?

14 A.    No, I don't think so.  I think that he does recognize

15 that he did hold those beliefs, and I think that's the

16 beginning stage of rehabilitation.  But it's not cured.

17 Obviously he's not having any intensive counseling.  He's not

18 going through any sexual offender treatment yet.  But I would

19 be the last one to say because he acknowledged it, it's

20 fixed.

21 Q.    He recognized it after he had been caught and after he

22 had been convicted.

23 A.    Absolutely.

24 Q.    But not before that?

25 A.    Of course not.

1   Q.    And you are aware that Mr. Lynch also has two children

2   in the Philippines?

3   A.    Yes, I am.

4   Q.    Is it your testimony that he places less value on those

5   children than children in the United States?

6   A.    That I do not know.

7   Q.    And your testimony is that when Mr. Lynch abused

8   Denise, Erica, Rica, and Liza, he thought he was helping them?

9   A.    No, I didn't say that either.  What I said was that in

10  the process of the behavior, there is a rationalizing

11  process.  That's mental illness.  That is basically sexual

12  offender-type issues.

13          In his belief system, part of what I think fed

14  into it was believing that in his own mind by somehow

15  compensating them or providing treats, if you will, that's

16  going to somehow justify his behavior.  But I'm not saying

17  that's okay.  I'm saying that's part of the problem.

18  Q.    Did he have that opinion even as they told him what he

19  was doing to them was hurting them?

20  A.    What opinion?  That it was --

21  Q.    That it was okay.

22  A.    I don't know.

23          MS. PERESIE:  One moment, Your Honor?

24          THE COURT:  Sure.

25          (Brief pause.)

1        MS. PERESIE:  Nothing further.

2        THE COURT:  All right.  Anything else,

3  Mr. O'Brien?

4        MR. O'BRIEN:  No, Your Honor.

5        THE COURT:  All right.  Thank you.  I'll excuse

6  the witness.  I appreciate, again, your accommodating me.

7        THE WITNESS:  Your Honor, thank you.  I'm just

8  glad you are feeling better.

9        THE COURT:  Mr. O'Brien, tell me why your client

10  should not go to prison for the rest of his life.

11        MR. O'BRIEN:  Judge, that's the question; isn't

12  it?  And here's my answer:  A lawyer, without a jury, must

13  address the issue in court differently; and this is where

14  Mr. Gerard might want to start writing down.  I think

15  Mr. Gerard was correct in his closing argument when he just

16  simply stated Mr. Lynch viewed the Philippines differently

17  than the United States.

18        There is no doubt in my mind and there is no doubt

19  in Mr. Lynch's mind that he's going to go to prison for a

20  very, very long time.

21        THE COURT:  Because as you know, Mr. O'Brien, a

22  child is a child is a child.

23        MR. O'BRIEN:  Judge, you don't have to tell me

24  that.  I assure the Court.

25        The issue is, can Mr. Lynch be rehabilitated; and

1  also the danger to the community aspect, I think is the most

2  important thing.

3          THE COURT:  On these cases, that is really the

4  overriding factor, in my opinion, is protecting the community.

5          MR. O'BRIEN:  Judge, I don't disagree with you.  I

6  live in this community, so I don't disagree with you.  I do

7  think, though, Judge, there is absolutely zero evidence that

8  Mr. Lynch had any of what you would consider typical child

9  pornography on any electronic device in his home.  Zero.

10          What I mean by that is, there were pictures and

11  videos of Filipino children, but zero of what you would

12  commonly see as searches from the dark web or these uploading

13  and downloading sharing websites.  Zero.

14          And the reason why I point that out, Judge, it

15  does not exculpate him from his criminal conduct; but what it

16  shows is when he's in the United States, he has a different

17  belief system.

18          THE COURT:  It's one thing to download porn, which

19  as far as I'm concerned is disgusting enough in itself, child

20  pornography, but, you know, he was going over there and

21  having sex with these kids.

22          MR. O'BRIEN:  Judge, again, there is no jury here,

23  so I'm not going to argue to the contrary.

24          THE COURT:  That's the thing that makes it so bad,

25  and you are talking to somebody who thinks just looking at

1   child pornography is totally revolting.

2          MR. O'BRIEN:  You are looking and talking to

3   someone who thinks the same thing, Judge.  But there are

4   penalties associated with that.  And the question is, should

5   Mr. Lynch die in prison as a result of his conduct; and

6   here's my argument as to why he shouldn't.

7          I'm not arguing that he should not go to prison.

8   I'm not arguing that he should not go to prison for several

9   decades.  That's not the argument.  The argument is, if he's

10  released when he's 75 years old or 80 years old, he will not

11  have the financial ability, nor will he have the actual

12  physical ability to travel to a foreign country.

13         He's going to be heavily supervised.  He will be

14  aged.  And, Judge, it's also very, very important to

15  recognize that when he's in the United States, he does not

16  abuse children and --

17         THE COURT:  Right.

18         MR. O'BRIEN:  Dr. McClain said there is a belief

19  system that needs to be changed; and he, for the first time

20  now, Judge, recognizes that.

21         So, if he can receive treatment while in the

22  Bureau of Prisons, I think that this Court can feel confident

23  that as a 75-year-old man, because he has no history of

24  harming a child in the United States, he has no history of

25  downloading child pornography in the United States, because

1    of his age, because of what likely will be ill health, he

2    does not have to go to prison and die there alone after a

3    life, Judge, of basically zero real criminal conduct.

4         I know he has had some arrests.  A DUI conviction

5    from 1991.  By the grace of God go a lot of people in this

6    world on DUIs.  It's also that DUI is directly related to his

7    alcoholism, which everyone accepts.

8         THE COURT:  Let's talk about consistency in

9    sentencing, at least as I impose sentences.  When I send

10   somebody to prison for ten years for downloading child

11   pornography, receiving child pornography, and going to those

12   chat rooms, or whatever they call it, where they trade child

13   pornography, someone like that goes to prison for ten years.

14   And I have sent a lot of those people to prison for more than

15   ten years, people who have never had an interaction with the

16   criminal justice system.  Not a one.

17        They go to jail for ten, twelve years.  And I sent

18   somebody to prison for life because he met a child and had

19   sex with her or committed sexual acts on her.

20        I mean, what your client did in a lot of ways is

21   so much worse.  I mean, it is.

22        MR. O'BRIEN:  I understand the Court's position.

23   I will say in response -- and this is a very -- Judge, there

24   is no easy argument here from my standpoint; but what I will

25   tell the Court is, obviously, the person that does that in

1    the United States makes no distinction.  A child is a

2    potential victim no matter where they are at any time.

3           At least Mr. Lynch understands -- and it's warped

4    and doesn't make it right, but I think it makes it less wrong

5    that in a community which he lives in, which is the community

6    which you must protect, he would not commit the same criminal

7    conduct that he would in the Philippines.

8           I think, Judge, here's my answer to the ten years

9    for the child pornography client, because I've had those

10   clients as well.  I'm not asking for ten years.  I'm asking

11   you to double that sentence.  Maybe even give him a 150

12   percent larger sentence than that person.

13          THE COURT:  But it's got to be much more

14   significant.  It's one thing to look at this stuff.  It's

15   quite another thing to have sex with a child.  Those are two

16   really very different things.

17          How about the sting cases that we see where

18   somebody thinks they are going to meet a child and it's a

19   cop?  Those people get ten years.

20          MR. O'BRIEN:  Mr. Lynch, Judge -- actually, those

21   individuals, Judge, the min-man is 10 years.  Ironically, the

22   sentencing guidelines call for 70 to 87 months on a person of

23   Criminal History Category I.  So those guidelines are out of

24   whack.  And I'm standing here as a defense attorney saying

25   that.

1          It's odd that on a sting case you can get a

2     min-man of 10 years, while the possession of child

3     pornography, because of all the enhancements associated with

4     computers, you are looking at a 150-month range.  So, I

5     concede that, which is why I'm not asking for a 15-year

6     sentence.

7          I'm asking for a couple of decades in prison.

8     Maybe even 25 years.  All I'm asking for is for Mr. Lynch to

9     have an opportunity to walk out of prison, perhaps see his

10    daughter once again, see his ex-wife.  Although their

11    marriage has not worked out, I'm sure the Court has seen his

12    ex-wife is present every time, because they are still best

13    friends.

14         THE COURT:  I didn't realize it was his ex-wife.

15    I only realized it after reading your proceedings.

16         MR. O'BRIEN:  Right.  And, obviously, it's not

17    appropriate for me to bring that up during trial, but I will

18    tell the Court she was present every day of the trial, along

19    with her father, Mr. Lynch's former father-in-law.

20         This is a man, Judge, that I believe, with the

21    right amount of circumstances -- and that is, being

22    incapacitated for a long period of time, to the point where

23    he's aged, infirmed -- and the average life expectancy of an

24    American male is 77 years, and that's someone that has access

25    to great medical care and living a stress-free life.

1          Mr. Lynch, in all likelihood, is going to go to a

2   very undesirable place, with undesirable people that he's

3   never had contact with before in his entire life.  So it

4   would be difficult for him.  A sentence of 25 years may be

5   life.  He may die.  I'm just asking for an opportunity,

6   Judge, because for the first time we have had a breakthrough

7   with him; and, that is, he has never committed an act,

8   whether it be a sting operation, seeking out a child through

9   the internet, looking at child pornography through the dark

10  web, he doesn't do that in the United States.  He does it in

11  the Philippines, and he's never going to go to the

12  Philippines again.

13          THE COURT:  I know.  But, gosh, I understand your

14  argument, Mr. O'Brien; and I, obviously, will reserve ruling

15  until I hear from your client.  But I think, if you go

16  someplace to have sex with a child, you just -- I think you

17  forfeit your right to be with the rest of us.  I just think

18  so.

19          It could be the Philippines.  It could be down the

20  street.  I think it's just so vile and vicious.  It's just a

21  horrible thing to do to another human being.

22          MR. O'BRIEN:  Judge, what we are asking for is

23  hope.  We are asking for a day that he might be able to walk

24  out of the prison and see those that he loves before he goes

25  on to wherever he is asking to be.

1          THE COURT:  I understand that.  I'll tell you,

2   there is something about 3,960 months in prison that I just

3   have trouble doing because it just --

4          MR. O'BRIEN:  It doesn't matter.  No one lives to

5   be that age.

6          THE COURT:  There's something that doesn't seem

7   right about doing that.  It just seems ridiculous, honestly.

8   I know it's a guideline sentence; but, Mr. O'Brien, your

9   client has to go to jail for the rest of his life.  I'm so

10  sorry to have to tell you that, and I'm sorry to have to tell

11  him that.  I want to make certain that he does not ever get

12  out of jail.

13         I'm just so sorry for you and for his family and

14  the people who love him; but I just think that if I do

15  anything different than that, I'm just not doing my duty to

16  protect the public.  I just feel so passionately about the

17  need to protect children.

18         Your argument about the Philippines versus the

19  United States, I think that's in a lot of ways a distinction

20  without a difference.  I'm not so certain I buy that.  But

21  even if I did -- let's just go on punishment.  You have sex

22  with a child, wherever that child happens to be.  As far as

23  I'm concerned, you just forfeited your right to be with

24  society.  Period.

25         I just -- I just can't do it.  I can't do anything

1  differently.  My conscience, the oath that I took as a judge,

2  doesn't allow me to do anything differently.  I will not make

3  my final decision until I hear from him, but that really is

4  the way I feel.  A sentence of 3,000 months?  I'm going to

5  come up with something different because that just doesn't

6  make sense.

7          MR. O'BRIEN:  Judge, based on the Court's comments

8  to me, then I will defer to Mr. Lynch at this point for his

9  allocution.  He has written a statement.

10          THE COURT:  I think he should for his own

11  well-being.  I think he needs to allocute.

12          MR. O'BRIEN:  Judge, he's going to allocute.  He's

13  taken great lengths to write his allocution.  He's nervous.

14  He's not a public speaker.

15          THE COURT:  He can stay seated and read, but I

16  think he needs to say something, just for his own sake.

17          MR. O'BRIEN:  He's going to allocute right now,

18  when I sit down.

19          THE COURT:  All right.  I'm happy to hear you now,

20  Mr. Lynch.

21          THE DEFENDANT:  Your Honor, thank you.

22          THE COURT:  You are welcome.

23          THE DEFENDANT:  Thank you for letting me speak.

24          I accept responsibility for my actions in this

25  illegal, immoral, and reprehensible behavior.

1          My pre-arrest rationalization of the activity that

2   I engaged in was completely wrong.  I employed horrible

3   judgment, which led me to engage in wholly inappropriate,

4   despicable conduct.  I was callous in my disregard for the

5   deep negative personal impact on such innocent children.

6          As a parent, I should have known that any

7   depiction of an unclothed person under the age of 18 is,

8   obviously, immoral and illegal.  And I had direct familiarity

9   with some of the victims, which gave me full knowledge of the

10  fact that they were under 18.

11         I'm very ashamed of this activity I've engaged in.

12  I acknowledge that.  Although I have a serious alcohol abuse

13  problem, in no way could I ever try to offer this as any kind

14  of excuse.  In no way is that even the slightest excuse for

15  this behavior.

16         As an educated, fully aware citizen and father,

17  responsibility lies with me alone.  Me.  The impact on my

18  family, what I have done, is permanent and devastating.

19         THE COURT:  Including your daughter, who now

20  doesn't have the financial resources that she previously had.

21  Your daughter with your wife.  The daughter that lives in

22  California, who is a college student, she's suffering, too,

23  because she doesn't have the financial resources that you

24  were previously providing to her.

25         THE DEFENDANT:  Yes, definitely.

1          She's the most important person in the world to

2     me.  I know I don't deserve them; and they are wonderful

3     people, all of them.  I've inflicted pain on them, and they

4     stood by me, and I owe them a debt of gratitude that I can

5     never repay.  I don't even deserve what they have done for me

6     for the last 14 months.  I know that.

7          I always tried to be a good father, and these

8     illegal and immoral acts have created victims among those who

9     have depended on me and that I love most dearly.  My family.

10          I've really yet begun to explain what I have done

11     in a way that will make any sense.  It's probably impossible,

12     but I'll have to try from afar during my long, likely

13     permanent incarceration that I'm about to have.

14          So I'm fully aware that today I will receive a

15     very heavy sentence which will extend to the balance of my

16     life, well past any that any of my ancestors had ever

17     attained.  And I accept my punishment, and I will survive

18     what awaits me.

19          My heaviest burden is not what awaits me

20     personally.  I've lived a full and active life and

21     experienced many wonderful moments, and my fate was

22     determined by my actions alone.  So my concern primarily is

23     how what I have done will impact my family and loved ones in

24     such a devastating way.  I loved and respected my mother and

25     father dearly until they passed away.  As such, the greatest

 1   offense I've committed is how my actions will by far

 2   permanently restrict my ability to be a father, a good father

 3   to the children I brought in this world.  I never dreamed

 4   that they would have to say that my dad is in prison.  It's a

 5   deep, deep shame to me.  But more than that, it's a permanent

 6   scar that I've given to them, to have a dad found guilty of

 7   the crimes I have.

 8           For my two young ones in the Philippines, I spent

 9   as much time as I could with them when they were infants,

10   until their relationships with their mothers deteriorated,

11   and recently with emotional and financial support which they

12   most lack because -- they have loving, extended families over

13   there, but they don't have financial support; and I know

14   that's going to be hampered as far as going forward.

15           So I am deeply ashamed, and I understand

16   everything that I've done, and I accept responsibility for

17   this immoral behavior.

18           Thank you for letting me speak.

19           THE COURT:  Thank you, Mr. Lynch.  I think that

20   was important that you make those comments.  You are

21   fortunate to have your ex-wife supporting you.  I know very

22   few ex-wives that would stand by their former husbands under

23   these circumstances, so I think you are really pretty

24   fortunate in that respect.

25           Miss Peresie, you heard me say he needs to go to

1    jail for the rest of his life.  I just can't impose a

2    sentence of 3,900 months.  To me, it's just -- it may be what

3    the guidelines call for, but it's just -- 330 years.

4    Realistically, the only time I've seen judges do that is when

5    they think that a sentence is going to be reduced or

6    overturned and you want to make certain the person stays in

7    prison for the rest of their life.

8            I don't see that here.  I just feel silly, I

9    guess -- maybe that's not the right word, but it just doesn't

10   seem appropriate to impose a sentence of 330 years when you

11   have a 58-year-old man.

12           MS. PERESIE:  Your Honor, if we could stand before

13   the Court asking for life, we would be asking for life.  I

14   think life is what is appropriate here for what he did.

15           The 330 years sends a message to not just this

16   defendant, but to the others, and we heard about some of

17   those others at trial.  They are abusing children in the

18   Philippines and think those children are somehow of a lower

19   value.  They think this is okay.

20           This is not acceptable to the United States, and

21   this is what happens if you got caught.  This is not someone

22   who committed one offense, who abused one child.  And there's

23   been life sentences, as Your Honor notes, in those kind of

24   cases.

25           This is someone who has four charged victims, and

1  additional victims.  This is someone who went to the

2  Philippines because he thought he wouldn't get caught.  He

3  got caught, but not until after eleven years of abuse and

4  exploitation.

5          THE COURT:  Don't you think I can send the same

6  message by imposing a sentence that is a more reasonable

7  sentence, like 40 years or 60 years?  He's not going to get

8  out of prison, but it just seems to me to make a lot more

9  sense than 330 years.

10          MS. PERESIE:  Well, with 40 years, he could

11  after --

12          THE COURT:  Sixty years, by making the sentences

13  concurrent on Counts One to Nine and Eleven.  That's 360

14  months; 240 months on Count Ten, and 120 months on

15  Count Twelve.  That's 720 months, 60 years.

16          MS. PERESIE:  That's still less than 20 years per

17  victim.  There are four victims here, four young girls.

18          THE COURT:  Were those counts alleged -- what

19  counts were those alleged in?  I don't have the Indictment in

20  front of me anymore, as to each girl.  Were those in Counts

21  One through Nine, or where were those?

22          MS. PERESIE:  One through Five was Liza.  I'm

23  trying to get the Indictment up as well, Your Honor, because

24  I don't want to misspeak, of course.

25          THE COURT:  Go back.  One through what was Liza?

1          MS. PERESIE:  One through Five were Liza, Six

2   through Eight were Erica, Nine was Rica, Ten and Eleven were

3   Denise, and 12 was the possession count.

4          So even if those were -- and I'm not suggesting

5   because we do -- 330 years sends a message.  But even if the

6   Court were to group those counts together, we would still be

7   looking at a guideline of 110 to 120 years, depending how we

8   did the math.

9          THE COURT:  I think when you have somebody at this

10  age, to impose that kind of sentence, other than sending a

11  message -- that is really what you are telling me; is that

12  right?

13         MS. PERESIE:  It's not just sending a message.

14  It's deterrence and the seriousness of the offense.  Age is

15  only one factor under 3553(a).

16         THE COURT:  You don't think a 60-year sentence

17  sends a really significant message, whether you are 20 or 60?

18  I mean, 60 years in prison?

19         MS. PERESIE:  Not the same message, of course,

20  that 330 years sends.

21         THE COURT:  Well, it's all really an academic

22  exercise for this defendant, when all is said and done.

23         And that's the bottom of the guidelines,

24  Mr. Edwards, the 3,960?

25         THE PROBATION OFFICER:  That's correct, Your

1   Honor.  Anything less than that would be considered a

2   variance.

3           THE COURT:  The Court has asked the defendant why

4   judgment should not now be pronounced; and after hearing the

5   defendant's response, the Court has found no cause to the

6   contrary.  The parties have made statements in their behalf

7   or have waived the opportunity to do so, and the Court has

8   reviewed the presentence report.

9           Pursuant to Title 18, United States Code, Sections

10  3551 and 3553, it is the judgment of the Court that the

11  Defendant, David Paul Lynch, is hereby committed to the

12  custody of the Bureau of Prisons, to be in prison for a term

13  of 3,960 months, 330 years.  This consists of terms of 360

14  months on each of Counts One through Nine and Eleven, 240

15  months on Count Ten, and 120 months on Count Twelve.

16  Counts Two through Twelve are to run consecutively to each

17  other and to Count One.

18          Upon release from imprisonment you shall serve a

19  15-year term of supervised release.  This consists of a

20  15-year term as to Counts One through Twelve, all such terms

21  to run concurrently.

22          While on supervised release, you shall comply with

23  the standard conditions adopted by the Court in the Middle

24  District of Florida.  In addition, you shall comply with the

25  following special conditions:

 1           You shall participate in a mental health program

 2    specializing in sexual offender treatment and submit to

 3    polygraph testing for treatment and monitoring purposes.  You

 4    shall follow the probation officer's instructions regarding

 5    the implementation of this Court directive.

 6           Further, you shall contribute to the cost of such

 7    treatment and/or polygraphs, not to exceed an amount

 8    determined reasonable by the probation officer based on the

 9    ability to pay or availability of third-party payment and in

10    conformance with the probation office's sliding scale for

11    treatment services.

12           You shall register with the state sexual offender

13    registration agency in any state where you reside, visit, or

14    are employed, carry on a vocation or are a student, as

15    directed by the probation officer.

16           The probation officer shall provide state

17    officials with all information required under Florida sexual

18    predator and sexual offender notification and registration

19    statutes.  It's Florida Statute 943.0435, and/or the Sex

20    Offender Registration and Notation Act, that's Title I of the

21    Adam Walsh Child Protection and Safety Act of 2006, Public

22    Law 109-248, and may direct the defendant to report to these

23    agencies personally for required additional processing, such

24    as photographing, fingerprinting, and DNA collection.

25           You shall have no direct contact with minors --

1   that's under the age of 18, without the written approval of

2   the probation officer and shall refrain from entering into

3   any area where children frequently congregate, including

4   schools, day-care centers, theme parks, playgrounds,

5   et cetera.

6          You are prohibited from possessing, subscribing

7   to, or viewing any images, video, magazines, literature, or

8   other materials depicting children in the nude and/or in

9   sexually explicit positions.

10          Without written prior approval of the probation

11   officer, you are prohibited from either possessing or using a

12   computer, including a smart phone, a handheld computer

13   device, a gaming console, or an electronic device capable of

14   connecting to an online service or an internet service

15   provider.

16          This prohibition includes a computer at a public

17   library, an internet café, your place of employment, or an

18   educational facility.  Also, you are prohibited from

19   possessing an electronic storage medium, including a flash

20   drive, a compact disk, and a floppy disk or using any

21   encryption technique or program.

22          If approved to possess or use a device, you must

23   permit routine inspections of the device, including any hard

24   drive and any other electronic data storage medium to confirm

25   adherence to this condition.

1          The United States probation office must conduct

2    the inspection in the manner no more intrusive than necessary

3    to ensure compliance with this condition.  If this condition

4    might affect a third party, including your employer, you must

5    inform the third party of this restriction, including the

6    computer inspection provision.

7          You shall submit to a search of your person,

8    residence, place of business, any storage units under your

9    control, computer, or vehicle, conducted by the probation

10   officer at a reasonable time and in a reasonable manner,

11   based upon reasonable suspicion of contraband or evidence of

12   a violation of a condition of release.

13         You shall inform any other residents that the

14   premises may be subject to a search pursuant to this

15   condition.  Failure to submit to a search may be grounds for

16   revocation.

17         The defendant having been convicted of a

18   qualifying felony shall cooperate in the collection of DNA as

19   directed by the probation officer.

20         The mandatory drug testing requirements of the

21   Violent Crime Control Act are imposed.  The Court orders the

22   defendant to submit to random drug testing, not to exceed 104

23   tests per year.

24         Based on the financial status of the defendant,

25   the Court waives imposition of a fine.

1          Are there any additional forfeiture matters to

2   consider, Miss Peresie?

3          MS. PERESIE:  No, Your Honor.  They were dealt

4   with in the final order.

5          THE COURT:  Okay.  It's further ordered that the

6   defendant shall pay the United States special assessments

7   totaling $1200, which shall be due immediately.

8          I'm not going to impose the $5,000 special

9   assessment pursuant to 18, U.S.C., Section 3014 because the

10  defendant is indigent.

11         After considering the advisory sentencing

12  guidelines and all the factor identified in Title 18, United

13  States Code, Sections 3553(a)(1) through (7), the Court finds

14  that the sentence imposed is sufficient, but not greater than

15  necessary to comply with the statutory purposes of sentencing.

16         So I struggled with the sentence of 3,000 months

17  because nobody would have the potential to live that long,

18  and so why impose a sentence that is greater than what

19  somebody's lifespan would be.

20         Eventually, as you can see, I was convinced that

21  it really was appropriate to impose that sentence.  First of

22  all, it's a guideline sentence.  And while I understand that

23  I have the authority to depart upwards, depart downwards,

24  vary upward, vary downwards, quite frankly, I can't find a

25  good reason to vary or to depart.

1          The defendant did what he did, and he deserves to

2     be punished.  He deserves to be punished in a very strict

3     fashion.  Indeed, there were four victims here.  They were

4     Liza, Erica, Rica, and Denise.

5          MS. PERESIE:  Yes, Your Honor.

6          THE COURT:  And those girls deserve to have this

7     defendant punished.  The defendant most certainly does have

8     some good qualities.  He basically has been law-abiding.  I

9     always admire somebody who takes care of their parents.  He

10    took care of his mother.  He loves his daughter from his

11    marriage.  He appreciates the fact that his ex-wife is here.

12    And he's also supporting -- or did support the children that

13    he had in the Philippines.  Those are all good qualities.

14         But, again, when you have children that have these

15    acts committed upon them, even if the mothers were complicit

16    in allowing this kind of horrible crime to be committed upon

17    them, it doesn't in any way exonerate the defendant.

18         He just deserves to be punished and deserves to be

19    strictly punished.  There needs to be -- as the prosecutor

20    said, it's important to send a message; but, to me, it's even

21    more important that society is protected, whether it's

22    society here in the United States or societies in other

23    countries and that individuals know that if they break the

24    laws, they are going to look at significant sentences.

25         So, ultimately, that's why I decided, despite my

 1   initial hesitation, that a guideline sentence was appropriate.

 2          Are you going to go ahead and dismiss the

 3   underlying Indictment, Miss Peresie?  I think that's what we

 4   have here.

 5          MS. PERESIE:  Yes, Your Honor.  There are multiple

 6   underlying Indictments.

 7          THE COURT:  The underlying Indictment should be

 8   dismissed?  Miss Peresie, should they all be dismissed, then?

 9          MS. PERESIE:  Yes, Your Honor.

10          THE COURT:  The underlying Indictments are

11   dismissed.

12          The government [sic] having pronounced sentence,

13   does the counsel for the defendant or government have any

14   objections to the sentence or to the manner in which the

15   Court pronounced sentence other than those previously stated

16   for the record?  Miss Peresie?

17          MS. PERESIE:  No, Your Honor.

18          THE COURT:  Thank you.

19          Mr. O'Brien?

20          MR. O'BRIEN:  No, Your Honor.

21          THE COURT:  Okay.  The defendant is remanded to

22   the custody of the United States Marshal to await designation

23   by the Bureau of Prisons.

24          To the extent permitted by your plea agreement,

25   you have the right of appeal from the judgment and sentence

1    within 14 days from this date.  Failure to appeal within the

2    14-day period shall be a waiver of your right to appeal.  The

3    government may file an appeal from the sentence.

4            You are also advised that you are entitled to

5    assistance of counsel in taking an appeal; and, if you are

6    unable to afford a lawyer, one will be provided for you.  If

7    you are unable to afford the filing fee, the Clerk of the

8    Court will be directed to accept the Notice of Appeal without

9    such fee.

10           I think in your memo, Mr. O'Brien, you asked that

11   he be housed near the Washington, D.C., area; is that correct?

12           MR. O'BRIEN:  That is accurate, Judge.

13           THE COURT:  Is there anyplace in particular that

14   you would like, or just anywhere near Washington, D.C.?

15           MR. O'BRIEN:  Anywhere in that Mid-Atlantic area,

16   Judge.  He has family and friends that live in the Maryland

17   area, which is where he grew up.

18           THE COURT:  I recommend that he be housed in the

19   Washington, D.C., area or in the Mid-Atlantic area so his

20   family and friends are able to visit him.

21           Anything else you would like me to recommend for

22   him?

23           MR. O'BRIEN:  Judge, the one thing that I am

24   concerned about with Mr. Lynch -- I'm not so sure you have

25   any control over -- is I'm fearful that with this sentence --

1   one of the reasons I didn't want this high of a sentence for

2   him is, he's going to go to a penitentiary, and I'm genuinely

3   fearful for Mr. Lynch in that type of an environment.

4          To the extent that Your Honor has any sway over

5   that -- I don't think it's necessary, given Mr. Lynch's lack

6   of criminal history, there is no violence associated with

7   anything he's done, he's been gainfully employed, he's

8   educated, he's 56 years old --

9          THE COURT:  Right, he's a college graduate with a

10  degree in chemistry.

11         MR. O'BRIEN:  I don't want him to go to a

12  penitentiary.

13         THE COURT:  Do you have a position whether he

14  needs to go to a penitentiary or be housed somewhere else?

15         MS. PERESIE:  Your Honor, we always defer to the

16  Bureau of Prisons.

17         THE COURT:  I don't think he needs to go to a

18  penitentiary.  I'll put in there, despite the high sentence,

19  the Court recommends to the Bureau of Prisons that he not be

20  housed in a penitentiary.

21         MR. O'BRIEN:  Thank you, Judge.

22         THE COURT:  I will do that.  But he does not have

23  a -- well, they will be able to see his criminal history.

24  I'll just make that recommendation and just leave it at that.

25         MR. O'BRIEN:  Thank you, Your Honor.

```
1              THE COURT:  You are welcome.

2              Anything else?  Can you think of anything there,

3    Mr. Edwards, that I might want to add to that?

4              THE PROBATION OFFICER:  No, Your Honor.

5              THE COURT:  Thank you.

6              Anything from the government?

7              MS. PERESIE:  No, Your Honor.

8              THE COURT:  Thank you, Miss Peresie.

9              Anything else, Mr. O'Brien?

10             MR. O'BRIEN:  No, Judge.  Thank you.

11             THE COURT:  Anything, Mr. Edwards?

12             THE PROBATION OFFICER:  Did you go over the appeal

13   rights, Your Honor?

14             THE COURT:  Yes, I did.  I believe I said that.

15             MR. O'BRIEN:  You did, Judge.

16             THE COURT:  All right.  Thank you.

17             We are in recess.

18             (Proceedings concluded at 4:16 p.m.)

19                        - - -

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


### REPORTER CERTIFICATE


        I, Scott N. Gamertsfelder, Official Court Reporter

for the United States District Court, Middle District of

Florida, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a true

and correct transcript from the stenographic notes taken by

the undersigned in the matter of *UNITED STATES vs. DAVID PAUL

LYNCH*, Case No. 8:17-cr-37-T-33AEP (Pages 1 through 53), and

that the transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.



/s/ *Scott N. Gamertsfelder,* RMR, FCRR

*Official Court Reporter*

                                  Date: May 9, 2018